So my name is Dean Alper, and I represent Mid-Century Insurance Company. It's the subrogee of a property owner named El Capitan. And I want to just start with the law that I believe is at the heart of our case, which is stated succinctly in Cruzi v. Amoroso, which held the following, it is clear that a tort duty runs from a contractor not only to the original owner, but to subsequent owners of the same property, stating that it's a basic rule deriving from the seminal case of Bianconia. So there's two points I want to begin to frame the application of that, and that, first of all, is that this is an ordinary construction defect case. The defense has tried to miscast it as something else, but it's just a typical, ordinary construction defect case. And the second thing is that El Capitan, the party that I represent derivatively, was an innocent purchaser of the building to whom a duty is presumptively owed as a member of the class for whom the work is performed. El Capitan was a stranger to the transaction. It had no reason to know that the building that it was purchasing had a defective or even a vulnerable sprinkler head system. And contrary to the thrust of the defense argument, California law permits parties not in privity to pursue a remedy regardless of whether the negligent services were performed pursuant to a contract or not. As the Beacon case reiterated recently, dating back all the way from Stewart v. Cox in 1962, contractors are held to a general standard of reasonable care for the protection of anyone who may foreseeably be endangered by the negligence even after acceptance of the work. So it's our position that there's no compelling reason in this case to deviate from the general principle that Simplex Grinnell owed a duty of reasonable care to this innocent purchaser damaged by its work. There are a number of factors, as you're well aware, under Bianconia. Very quickly, future owners are considered to be intended beneficiaries of a contractor's work. That's in our favor. The second factor, the most important factor, is foreseeability. Was it foreseeable to Simplex Grinnell that its sprinkler heads, as protected, could produce future damage? Of course, that's why they were doing the work that they were doing, and that's why they were paid an extra sum to protect those sprinkler heads. On foreseeability, was it foreseeable that a future owner would be among the limited class potentially harmed? And again, the Court has held that as an innocent purchaser of a building, that's within the class that is foreseeably protected. Injury, that's stipulated, too. Of course, there was injury. The fourth factor is the closeness of the connection between the defendant's conduct and the injury that suffered. And here, Simplex was paid to protect the head guards. The only reason to do that, 30 or more feet up in the air, was to protect them from flying soccer balls. Yet Simplex Grinnell negligently failed to make any assessment of how they needed to do that, and they implemented a method that was clearly insufficient, regardless of how frequently those sprinkler heads were attacked. Can I ask you this? Please. I know you focused on whether a duty was owed to your, what's the name of the entity? Sorry. El Capitan. El Capitan, yes. But do you read the district court as also saying just as a matter of law that no reasonable jury could find breach here as well? Well, the court talked about breach quite a bit, and we think that that was a mistake. Did you all brief that as part of the summary judgment briefing? We did not brief it. Okay. And it was not contended by the defense that there was no breach. It was all about duty, and it was narrowly circumscribed. Because that's a legal issue, and the court felt it could resolve that as a matter of law. So from our perspective, the court conflated a lot of issues that it felt were questionable in terms of both causation and breach in reaching the conclusions that it did. I'm just looking at the statement, I guess this is on page 18 of the district court's identified any duty, put in quotation marks, that Simplex breached. And it, you know, goes on to explain why the court concluded that. And that all actually sounded, to be honest with you, perfectly reasonable to me, that there just was no breach. I think on the law, you're right, that certainly a duty in the abstract was owed to El Capitan, but it just doesn't strike me as a compelling case for breach at all. And I guess I wondered if that was an alternative basis on which this Court might  draw from, but you're going to tell me now. Well, I'm going to tell you first that the record is insufficient here for this Court to sustain a ruling for the defense on that basis. And then I'm going to tell you that we introduced substantial facts, and I direct you directly to Joint Facts 20 to 30, wherein there are all manner of admissions that the sprinkler head protection was not assessed, that the guard that was used was for low impacts. When we put all of those facts together, what we have is a remarkable carelessness with respect to the singular duty to protect the sprinkler heads from foreseeable harm. So it is, of course, our argument that they're not going to prove that there was no breach. Well, I just, I mean, this is a random fact, so I grant you that maybe it's not a fully developed record, but there were one or more people who said, yeah, we went around a lot of these other similar indoor sports facilities, and nobody has anything more than what Simplex put on these things, right? And we say that that is a positive fact for us, and that's for this reason. There's no reason for our predecessor in interest or for the contractor, for example, to know what Simplex Grinnell needs to know, which is there are alternative, economically feasible ways to protect these sprinkler heads. Well, look, I mean, from the defendant's standpoint, they say we gave you, not you, but we gave El Capitan the strongest protection that we have available to us. The only other thing you could do is put up a big net, and we don't even do that. So you're saying they were negligent because they didn't advise, hey, you know what? The best we can do is not going to be good enough. You better go hire someone else to put up a net. That's really what your theory of negligence is here, right? I would disagree. I'd say our theory of negligence is this. They undertook, for compensation, the duty to protect the sprinkler heads. So they had to act in a reasonably diligent manner in the commercial context they were operating in to protect the sprinkler heads from foreseeable harm. And that was — there was a specific kind of foreseeable harm that they needed to protect them from. So they need to go out in the marketplace, and they need to make some assessment. What we found out was that nobody else puts on these sprinkler heads, anything more than we've done, at least for the ones that are, as I understand it, I don't know if it was you or the other folks who gave us the picture, but, I mean, for this thing to break off in the way that it did, it's kind of a freak accident, a one in — six in one million or whatever somebody said, right? It's not like — I mean, I could see if the sprinkler head were sticking down right in the flight path of soccer balls. That's a different thing. But the way it was positioned, I could understand why they'd say what we've provided is enough. We went around and looked at other indoor sports complexes. They don't offer anything more. You know, stuff happens, and that's why you get insurance to guard against property damage and the like, and that's what your client is here for. So just, you know, that's where the risk should have fallen, not to put it on the sprinkler installer company. Well, the sprinkler installer was paid for the specific purpose not only of installing the sprinkler heads, but to protect them. And they did not undertake the work of going out and checking what alternatives were. And I think it is careless for them to rely on the argument that we just gave them the best thing we had, because the best thing they had was obviously not good enough. And the record through the report of Mayo establishes that use of protective netting is well known out there in the marketplace by the people that pay attention to detail and try to protect sprinkler heads in other alternative locations. Also, I don't know that the six in one million or whatever is, was an uncontested or even had any, could have survived a challenge as to the, it was an off-the-cuff kind of remark, if I recall how that remark surfaced in the trial. And, Judge Rakoff, that was from a contractor that hired the sub. And, of course, there was a previous incident in this very, your opponent raises that for different reasons, but if it's only six in one million, how come it happened twice here? Well, you're ahead of me, because they say it's once in a million, and then they say, well, there must, there seems like there was some notice of some prior events which they refer to in vague terms, but there's no specifics enough so that we can understand whether that gave anyone a sense of appreciable harm to know that they should be reconfiguring these things. Counsel, sorry to cut you off, but you are well into your co-counsel's time, and I can see him getting nervous and antsy over there. Let's give him his opportunity. When I come back, I want to talk about completed and accepted. You better hope he leaves you some time. No, we'll give you a minute or so in rebuttal. Thank you, Your Honor. See, the time is still ticking away, so I'm just going to jump right into it. Please. I do think that one of the things that I want to address is that I came to this case later than Mr. Alper, you know, and so I have new fresh eyes like the Court. And the thing that I got most intensely upon viewing the district court's opinion is the degree to which I believe that the Court has resolved a number of factual disputes and the import of those disputes, like these one in six million odds quote that was quoted many times in opposing counsel's brief sent in the district opinion, in favor of the moving party. You know, those are the implications of that are then used by the Court to in some sense play heads, the defense wins, tails, the plaintiff loses. And I want to get to how that interacts specifically with this two instances. On the completed and accepted portion of their argument, for example, they argue that the fact that it was an unforeseeable event, or the Court states that the 6-in-1 million event means that it was a patent defect, that anyone could look up and see that there was no net, and that if this kick were to happen, that that would have occurred. And they say that that simple view makes it a patent defect. However, when it comes to the be in conja factors, they use the same fact about the improbability, and they ignore that to justify for the second factor that it was a not foreseeable risk of harm. And those in fundamental tensions between how we can spin the same fact two different ways make it, I think, an unreasonable expectation that we would ever be able to that, I'm sorry, I'm getting a little ahead of myself, makes it an unreasonable expectation that the Court is resolving those issues in terms of how you would spin those factors against the party that is the nonmovement. Similarly, and I want to get to your question that you asked my co-counsel, which is about the breach and the fallen net. The one thing that the district court opinion states right at the beginning is that tort law and contract law have different things that they're trying to address, and that tort law is about vindicating social policy and allocating the risks of who needs to behave appropriately onto the appropriate social actor. What we have here is, if I'm understanding your question correctly, a proposed rule that would place the burden of foreseeing these kinds of risks on the person who is entering the marketplace specifically to hire expertise from someone else who is in the line of commerce and in the business of providing a service. The reason that our clients, the insured and the University of Sports, didn't install the system themselves is because they trusted Simplex Grinnell to install these services. The reason that they asked for a safety device and they chose to offer safety devices is because the person who had the expertise, the person who made those representations, that they had the knowledge to protect those heads, recommended that item. Robertson, Yeah. And the protection they provided would be sufficient in all but the rarest of circumstances. Because the way the thing was positioned in relation to the roof, as I understand it, you'd have to have the ball go up, what, 30 feet and still have enough force to ricochet off the roof and come down and just shear off the thing that's sort of sticking up from the pipe. It's a pretty, it's kind of a freak accident. And I could understand why in that industry they might say, hey, you know what? What's generally considered sufficient is whatever these, the two-piece guards on top of the thing. And it's positioned such between the pipe and the roof that the likelihood that a ball could get up there and hit the thing with sufficient force just to break it off entirely and flood the whole place is so minuscule that it's not considered worth the cost of installing this elaborate net. That might well be, that's why I say, it might just be that there's no breach here. I understand what you're saying, Your Honor. However, the exact argument you've laid out is a factual dispute for the province of the jury, you know. And because as your, as this esteemed colleague over here, your esteemed colleague has pointed out, it may be a freak accident, but it happened twice in a relatively short period of time, just a number of years. So the extent that what you were saying is true, it's a, that's an issue for the jury to decide whether or not it was so freakish just to render no breach of duty possible in these particular set of circumstances. What evidence was offered factually to support the argument that this was not a freak accident? Well, I believe that at deposition, as stated in the briefing, we described that it was, that there were two incidents. You know, there was one previously where the sprinkler head had been substantially moved as a result of the ball. It didn't shear because it didn't hit with quite the same amount of power, but it did cause damage. It caused the exact same kind of damage, you know, that leaks had occurred, that water had flooded onto the field. It just wasn't as extensive. I see I'm almost out of time, and I do want to reserve for my counsel. No survey of nationwide or locally or in the region of indoor soccer facilities? No, Your Honor. To be honest, I don't know what sort of sample size of those larger indoor soccer facilities exists or if such a survey would necessarily have been possible. Certainly, as a result of, you know, we're talking about insurance record damages. No, the answer is no, nor do I think it would be possible to do such a survey. Okay. Thanks very much. Let's hear from the other side. Good morning. The district court in this case did exactly what California state substantive law told the court to do under these circumstances, and that was where you have a contract that was entered into in 2002, and you have a subsequent purchaser and parties that were not privy to that contract. You apply the balancing factors in the Biancongia test to the fact pattern and see if the plaintiffs first establish a tort duty. And the district judge in that case carefully applied those factors to what is a somewhat bizarre fact pattern and a fact pattern that is very different in kind, both in quantity and in type, than the other kind of California cases where a tort duty has been found in the construction arena. So whether we're going to debate whether this is a construction case or not, in that arena where the California Supreme Court and some of the intermediate appellate courts have found a tort duty, those cases are very different. They're cases where you've got a full homeowners association, and down the road you have homeowners whose insurance policy likely provides no recourse for, you know, water seepage or thermal conditions that make the house uninhabitable, like the Beacon case. Something like that that causes direct injury to property or person, to somebody that's not going to have any recourse, those are the kind of construction defect cases. I guess I just am fundamentally confused by your position on the duty question, because I can't for a second think that you're right, that there's no duty owed whatsoever. Your Honor, there could be a duty. Okay. There could be a duty, and that's what the district court got right. The district court got right that in assessing this where you're dealing with not the original contracting party, but a subsequent purchaser, to decide whether a tort duty applies, you carefully apply those Bianconchi factors. And the California Supreme Court has overruled it. No, no, no, no. Please. Sorry. No, go ahead. So assuming for the sake of argument that we think the court did not properly analyze those factors and that there is a duty, is that the end you lose? That's not the end, Your Honor. I think there's two points, and Judge Watford has raised the second of those, which is whether you can affirm on alternative ground on the breach issue. The second issue is the one we briefed on the complete and accepted doctrine. So on the breach issue, and forgive me for interrupting the flow of your argument. No problem. On the breach issue, why isn't that a jury question? It could be. Again, it's you apply. No, but why on the facts of this case isn't it a jury question? For a lot of the reasons that Judge Watford has already said. Was it part of what you moved on below? I don't believe that it was. So they were never given the opportunity to develop the record on that issue. So why isn't that ground in and of itself to send it back, assuming we reach that issue? The court in its inherent power can still affirm on any ground that is sufficiently contained in the briefing. But at the stage in the district court where the decision was made that brings you before this court, the issue, as you just told me, the issue was not raised, was not briefed. No one was asked to scour the record to raise what would be the relevant facts. Why isn't it more prudent for us to then send it back to the district court and let that be developed? I don't think that's necessary where you have a case like this where the material facts are all stipulated material facts. Basically, in the record, there's around 32 stipulated facts that are uncontested. And you take those facts, you apply them to the breach issue, and it doesn't create a genuine issue material fact. And you think that no reasonable juror, for example, could find that this was not a freak accident, even though it occurred twice on this very location? Not the exact precise location of that sprinkler head, but no. No, but in a facility. Correct. But the fact that there was one prior instance with another sprinkler head I don't think would create a genuine issue material fact. How many times would it have to happen before we had a reasonable juror taking everything most favorably to the non-moving party to conclude that it wasn't just a freak? Well, I think that's not the sole inquiry, though. I mean, obviously, the more of them you have, the more foreseeable it becomes. And by the same token, you strengthen the completed and accepted doctrine as extinguishing legal duty. But there are other issues that aren't controverted in the record, like the fact that you're dealing with on the other side when the contract is entered. The type of head guards that you're putting in are the strongest ones available. That's what the literature says what they do, and it also says the fact that there are risks that it can't prevent. And you've got somebody who went out on behalf of, as an agent of all the plaintiffs, and surveyed other soccer fields, what they did, the kind of things that they put in. Those facts, which are undisputed, all bear just as heavily, I would suggest, more heavily on that issue than the fact that there was or was not one other prior incident or not. And if I could return briefly to the completed and accepted doctrine, you know, the district court also granted summary judgment on that basis. You go back 150 years in California case law. The general rule used to be once the owner accepts work, you have extinguished all tort liability, whether it's to the purchaser or to third parties. Now that has become, I wouldn't say the exception, but it is the completed and accepted doctrine extinguishes liability, so long as there is knowledge on the part of the owner that there exists the potential for a defect. So the district court here, again, on an uncontroverted record, said Mr. Duslack spent significant time looking at the risks and potential issues that could arise. And you also experienced one time where a soccer ball did cause some damage to a sprinkler head. So now you know as the owner, once that has happened and you've accepted that as a stipulated fact, that there is the potential for damage to these head guards and the sprinkler heads, notwithstanding you're purchasing the best sprinkler head protection that we offered at the time. So you know then at that point as the owner, like in the Sanchez case, which I would submit is a closer call for whether or not tort liability exists, because there you have a personal injury plaintiff who slips on a set of stairs that the court said, we're going to cut off liability to the contractors that constructed those stairs because the owner had noticed that water could accumulate. There was testimony in the record establishing that they had knowledge of prior instances where water would accumulate there. So even on a record like that, the Intermediate Court of Appeals in California said the owner has sufficient knowledge of a condition that could be dangerous based on — I thought that doctrine, though, was limited to cutting off liability to third parties and that it had nothing to do with the kind of case we've got before us. Am I wrong on that? I don't think that's the way it reads. Who was sued in the Sanchez case were folks who were similarly situated to Semplex Grinnell in this case. It was design builders and contractors. I think there was a cement contractor that was sued as part of that. Right, but where the plaintiff is a third party, not the owner. Are the cases you're relying on, they involve the owner trying to sue the contractor? They do as well. I think the other fact here, too, Your Honor, is we don't actually have the owner suing. We have two insurance companies. The original owner with whom Semplex Grinnell had its contract, had its relationship, Bishop and Bishop, sells the property to El Capitan. So it's a subsequent purchaser. We didn't have a relationship with them. And we also have suing and subrogation. The property, the lessee, University of Sports' insurance carrier. So it's another situation where the party, just like Sanchez, the party with whom the direct contractual duties ran isn't the party suing in this case. And so that's why the analysis there and how the completed and accepted doctrine applies is apt and why the district judge correctly reached the conclusion she did on the stipulated record. If I can return. So you think just before, if you're going to move off the completed and accepted doctrine, you think the key point there for that doctrine to work for you is that the defect has to basically be obvious to any fool who looked up at the ceiling, right? Right. Okay. Right. And I mean, it just seems to me you're not going to be able to have it both ways on this. If it's a 6-in-1 million kind of incident that could cause this kind of damage, it just strikes me as it's obviously not obvious, especially not to someone who's not an expert in the area. But I think the issue there, you know, the district court approached the two arguments, the issue with the net and said anybody who looks up knows that there's not a net preventing soccer balls from hitting whatever's on the ceiling. Yeah, but the reason there isn't a net is because supposedly there are these state-of-the-art guards to obviate the need for a net. Isn't that the whole point of having these guards? It's to protect them from being hit by objects. Which would not be necessary if there was a net. So this is a substitute. This is being marketed as a substitute for an unsightly net. Not a net. I wouldn't say a net in entirety. I mean, you still have soccer balls that are going to reach the ceiling. Right. But the reason I assume that your client was operating on the assumption that the guards that were provided would be sufficient is because of the ‑‑ I understand. This thing is almost at the roof, right? Right. So by the time a soccer ball, even if kicked with some force, got up there, the kind of force it would have for a direct impact, it's not going to be ‑‑ we're not talking about kicking a soccer ball, you know, at this distance, right? Or a light or something like that. Right. So that's why, you know, most people looking up would think, hey, we've got some protection up there. That's probably sufficient. Now, along comes this freak accident, and it floods the whole damn place. Okay, now maybe we need to put a net in. That's kind of how it works. But that doesn't mean that it's obvious, that the defect in the work that your client provided is obvious to the owner of the building. I just ‑‑ Well, I don't think the case ‑‑ Looking up, I don't think we ought to play soccer in this room. Judge, you'd probably be safe if you let me play soccer in this place. But anybody who's halfway skilled, I would agree with that. But to Judge Watford's question, though, I think the issue is the exact, you know, microscopic chance that that particular sprinkler head could be damaged I don't think is what drives the whole inquiry. What drives the inquiry there is the fact that they know they've got some degree of protection with these head guards, and they know that there's been a prior occurrence where a head guard, notwithstanding the head guard being there, allowed a sprinkler head to be damaged. So you know that you have the risk there. Maybe it is minuscule, and it's probably even far beyond minuscule on particularized heads like that one that, you know, sat way up on the bottom side. It was an upward-pendant head on the underside of a beam. But the category and type of risk, which I think is what the case law speaks to, you know that it can happen at that point. These may protect in 99.9 percent of all circumstances. Tell me this. The prior incident, I couldn't find much in the record that told us about the severity of it. But my guess is that it wasn't — it didn't involve an entire — like, it didn't involve the sprinkler head being sheared off where the whole facility flooded. I assume we would have had this lawsuit at that point. That's probably right. Right? Yeah, that's probably right. Okay. So that — it seems to me that prior incident doesn't really shed a whole lot of light on this, because as the tenant or the building owner, sure, if I have — if I become aware of some incident where, okay, yeah, there was some damage done and maybe a little water leaked out. It was a pain in the ass, but we cleaned it up. That's fine. But that doesn't mean I'm supposed to anticipate that a ball is going to ricochet off the roof with such force that it's going to shear off the whole thing and flood my entire facility. That's just a — it's a totally different thing. And so I wouldn't necessarily go to the expense of putting up a net just because a little water leaked out, unless I knew somehow that, boy, the — you know, the magnitude of the risk I'm facing is much greater than what was revealed. I think, though, if that strand of thinking carried the day, though, that the Sanchez case comes out differently. You know, I mean, you might have some degree of puddling on stairs, and it's a high-traffic area, and years go by, and, you know, maybe you get complaints of people saying it's slippery. Maybe you get somebody who rolls an ankle, and then all of a sudden you have a very serious case and a serious injury, and a lawsuit's filed, and you go on down the road. It's the fact that you knew that risk was there in the work. You knew that there was a risk that because of the puddling, which was the condition created by the claim defect, that something like that could happen, that there could be some risk of, in that case, injury to a person. Here we know we've had the head guards in the past, and granted the exact magnitude hasn't occurred, but you know under certain circumstances, because you've had it once and you've stipulated to that, that something can happen to the sprinkler head. If I can quickly return, because I wanted to touch upon some of the questions that Judge Watford had asked about the breach issue and whether Judge Hamilton's findings went more to that than they did the duty question. If you look at the Biancongia factors and some of the same facts that we've been discussing, a lot of those same stipulated facts, whether they go to breach as well, also tie into the duty equation. And that's where the district court did hit the nail right on the head in walking through some of the foreseeability type issues, the six and one million, even if it was tongue in cheek, it speaks to the general rarity of this incident. And a lot of those stipulated facts tie into three or four of those factors that the court was required to assess prior to making a duty determination, which is the issue of law that she was required to make. And I think that those same factors drove the correct conclusion. And for all the reasons that we've discussed here and on brief, we would ask that you affirm the district court's order. Thank you. Okay. Thanks very much. We'll give you a minute for rebuttal. Thank you. Breach was not an issue that was decided below. It wasn't considered to the extent that there was information about breach that was contained in a report that Mr. Mayo issued, an expert, and he found that there were numerous breaches that were submitted for other purposes by the defense. With respect to the completed and accepted doctrine, it's clear from the very language of the Sanchez v. Swinterberg case that it cuts off the indemnity rights that may flow relative to third party claims. And that's exactly, in response to the question that you asked, what the Swinterberg case was about, Sanchez. It was about a third party personal injury plaintiff's rights being cut off as to the contractor because there was an intervening, supervening acquisition by the owner of the property. So, number one, on completed and accepted, it always is applied with respect to claims made by third parties. It does not cut off claims that are made directly, construction defect claims, by the principals or by the foreseeable subsequent purchasers of a building. Okay. Thank you very much. The case just argued. Does he get a? Do you have something? I do. Okay. Very good. The case was well argued on both sides, and it will be submitted, and we are in recess for the day. Thank you. All rise.
judges: Rakoff, Hawkins, Watford